[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 STATEMENT OF THE CASE
The plaintiff, successor in interest to the original plaintiff Founders Bank, seeks to foreclose on a mortgage dated July 21, 1988 and executed by the defendant Charles and Susan Kelly to Founders Bank. That obligation is not denied, but in a special defense, the Kellys claim payment of the note by virtue of a payment in the amount of $100,000.00 made on or about April 20, 1989.
In related special defenses, the defendant Webster Bank, successor to First Constitution Bank, asserts the allegations of the Kellys and CT Page 7551 further claims it holds a mortgage on the subject premises.
This mortgage is alleged to have become a first mortgage, replacing the Founders Bank mortgage, by virtue of a loan of $100,000.00 made to the Kellys to pay off the Founders Bank mortgage. This loan is alleged to have been made on the representation of Founders Bank that it would accept said payment in full and release its mortgage There is no release of the Founders Bank mortgage on record so that the First Constitution Bank mortgage (now owned by the defendant Webster Bank) appears of record as a second mortgage.
 FACTS
These facts appear to be undisputed. The payment received by Founders and advanced by First Constitution did not fully discharge the indebtedness of the Kellys on the mortgage to Founders. Subsequent to that payment, Charles Kelly continued to make payments on account of the Founder's mortgage and also received further advances.
Then, in accordance with the terms of the Founders note, Charles Kelly commenced making regular payments of interest.
The attorney who handled the closing on the Kelly — First Constitution mortgage had no cover letter from Founders setting forth the alleged arrangement, but he understood from a conversation he had with someone whom he could not recall that the payment was "to include a release".
On December 2, 1990, the Kellys submitted a financial statement to Founders Bank in which they list as "mortgages" the obligation to Founders.
On September 16, 1994, Founders wrote to Mr. Kelly to advise him his account was "seriously past due", and that he was in default on his note and mortgage. (Emphasis added). In that letter, the bank included the appropriate advisements to a debtor whose residence was being foreclosed and outlined the foreclosure process.
The parties stipulated that the Kelly property had a fair market value, as of May 2, 2000, of $172,000. The indebtedness on that date was $229,653.53.
 DISCUSSION I CT Page 7552 As to the Defendants Charles and Susan Kelly
From the evidence presented at trial, there is no question these defendants executed the mortgage deed and note in question, nor is there any question that the $100,000.00 payment did not pay the note in full, and that the Kelly's continued to make payments and also received further advances under the terms of the notes.
These defendants have not proven their special defense of payment nor have they sustained their burden of proof as to their counter claim, which was not addressed at trial.
 II As to the Defaulted Defendants
Subsequent encumbrances on the mortgaged premises were filed by the defendants Manufacturer's Lease Company and Edward A. Griggs.
These parties having been defaulted are subject to a judgment of foreclosure.
 III As to the Defendant Webster Bank A
Both parties have submitted briefs and each recites what that party perceives to be the facts in the case. The defendant takes exception to statements made by the plaintiff in paragraphs 6, 11 and 12 of its brief.
However, regardless of the conflicting statements, these facts are undisputed and have significance in the court's deliberations:
1. The defendant did not produce a release of mortgage from Founders Bank, nor was one recorded on the land records.
2. The defendant did not produce a mortgage payoff letter from Founders to the closing attorney.
3. There is no written evidence that Founders agreed to release its mortgage.
4. The closing attorney for the First Constitution mortgage had no correspondence with Founders regarding a release, but thought he had CT Page 7553 spoken to someone there about it.
5. After the $100,000.00 payment in April of 1989, Mr. Kelly continued to receive cash advances from Founders so that within seven months he owed $149,765.71.
On these facts alone, the defendant's claim presents troubling questions which bear on its validity.
 B
The defendant has interposed as a special defense that of payment in full. The evidence adduced at trial indicated that after the $100,000.00 payment, there was a balance of $23,954.46.
No evidence was offered to suggest that Founders agreed to accept $100,000.00 in full settlement. The history of the Kelly loan account belies this notion, with Founders and Kelly proceeding to treat the note as a viable instrument until 1994. Until the default, Kelly received advances and made payments of interest and principal.
One would also expect that if this payment were to be made and received in full payment, Founders would issue a release of mortgage and First Constitution would expect one. This did not happen.
And, as noted above (see "Facts"), in 1990, the Kellys listed on their financial statement to Founders "mortgages" in favor of Founders. Apparently, not even the debtors felt they had eliminated the mortgage with the 1989 payment from First Constitution. This defense must be rejected.
 C.
This defendant asks the court to apply the doctrine of equitable subrogation to this situation and elevate its mortgage to a first encumbrance. This case, however, is quite unlike the case the defendant relies on, Home Owners Loan Corp. v. Sears. Roebuck Co., 123 Conn. 232, (1937).
Here, there is no evidence that Founders Bank was a party to the claimed agreement to release its mortgage without full payment. The closing attorney's check, without more, cannot be accepted by the court as sufficient evidence of such a unique agreement having been made. This is a particularly weak position to urge in the absence of the documents which would customarily be produced from a real estate closing. CT Page 7554
The court's characterization of the defendant's version of the transaction as "unique" is based again in part on the subsequent history of the Founders — Kelly relationship, whereby Kelly's indebtedness rose substantially (see Section III A, above), a highly unlikely course for Founders to take with an unsecured debtor.
Basically, the defendant is asking the court to save it from the consequence of the negligence of its predecessor in not getting a release of mortgage.
The court rejects the prayer for application of the doctrine of equitable subrogation.
 D.
The defendant's remaining legal argument is that the mortgage is invalid because it does not adequately describe the debt it purports to secure. This alleged deficiency arises from the fact that the note secured by the mortgage in question was not recorded with the mortgage, though it is referred to in the body of the mortgage, The mortgage does state the date of the note, July 21, 1988, and the principal amount $150,000.00
At the time the predecessor of this defendant made its loan to the Kellys, April of 1989, the mortgage in dispute was less than a year old and stated an obligation of $150,000.00. The actual balance in April of 1989 was $123,954.46. And, Mr. Kelly advised his new lender of the actual balance. Thus, at the time the loan was made, the lender knew all it needed to know and has offered no evidence of its being misled or prejudiced by the absence on record of the note itself.
The defendant evidently is of the opinion that the deficiency itself is sufficient to invalidate the mortgage, regardless of the lack of prejudice.
The court finds that the case of Dart and Bogue Co. v. Slosberg,202 Conn. 566 (1987), relied on by both parties resolves the issue.
"The plaintiffs claims that the defendant's mortgages are invalid is based on the mistaken premise that "[o]ur recording system is predicated upon the principle that one searching the land records can learn all he needs to know about the ownership of the land and its encumbrances from the records themselves." (Emphasis added.) This argument overstates the purpose of record notice. The record need not recapitulate all the particulars of a secured obligation, provided it includes enough information to allow subsequent creditors, "by common prudence and by the CT Page 7555 exercise of ordinary diligence, [to] ascertain the extent of the incumbrance." First national Bank v. National Grain Corporation,103 Conn. 657, 663, 131 A. 404 (1925). A creditor who wants to know all of the terms of a secured obligation may inquire of the parties themselves, or examine the note or other instrument evidencing the obligation.Winchell v. Coney, supra, 30-31; see First National Bank v. NationalGrain Corporation, supra; Pettibone v. Griswold, supra. In modern secured lending, such inquiry is prudent as a matter of course. A potential secured creditor may wish to know, for example, whether a mortgagee has exercised rights under an acceleration clause, or whether contemplated future advances have in fact been made, or whether a mortgagor has exercised rights to extend or renew a promissory note. No creditor can expect to glean all of this information from the record alone. The record is the starting point for inquiry, not, as the plaintiff claims, the starting and ending point."
Supra, at 579-580.
The court in Dart Bogue goes on to discuss those "circumstances in which a subsequent lien creditor can legitimately complain that a mortgage has failed to provide reasonable notice of the nature and amount of the secured obligation." Id, at 580. The court finds none of situations discussed applicable to this case.
The court in Dart Bogue at page 581 concludes:
"We reiterate that a mortgage need not set forth all of the terms of the underlying obligation provided that it gives notice of the nature and amount of the obligation, so that subsequent lien creditors are not misled."
The court rejects the defendant's claim of invalidity and finds the mortgage in question to be valid and enforceable against subsequent lien holders.
 CONCLUSION
The court finds the value of the subject real property to be $172,000.00, with $50,000.00 attributable to the land and $122,000.00 to the improvements.
The debt is found to be $229,653.53 at the time of trial.
The plaintiff is entitled to interest, attorneys' fees and taxable costs as follows: CT Page 7556
a. Interest from May 2, to date at $43.45 per day $ 2.172.50
b. Attorney's fees $ 3.500.00
Judgment Total $235.326.03
plus costs as taxed by the clerk.
A judgment of strict foreclosure may enter with the law day for the owners of the equity of redemption at July 12, 2000 and subsequent days for the junior encumbrancers in the reverse order of priorities as listed in the complaint.
Anthony DeMayo, J.T.R.