## FIDELITY NAT. BANK & TRUST CO. OF KANSAS CITY v. SOUTHERN UNITED ICE CO.

### No. 10170.

Circuit Court of Appeals, Eighth Circuit.
June 26, 1935.

Robert B. Fizzell, of Kansas City, Mo. (Justin D. Bowersock and John F. Rhodes, both of Kansas City, Mo., on the brief), for appellant.

Ralph E. Murray, of Kansas City, Mo. (Clifford Histed and William S. Hogsett, both of Kansas City, Mo., on the brief), for appellee.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

WOODROUGH, Circuit Judge.

This suit in equity was brought for the purpose of having it adjudged that appellee was the owner of eighteen $1,000 sinking fund bonds issued by appellee, and that appellant had no interest in them. A decree was entered granting the relief prayed, from which this appeal has been taken. The appellant has lodged the bonds with the clerk of the District Court to abide the outcome of the appeal.

It appears that appellant is a national bank transacting business in Kansas City, Mo., and the appellee is a corporation organized under the laws of New Jersey. The bonds are negotiable instruments payable to bearer. They at one time had been sold to the public, but had been repurchased by appellee and were being held by it in its treasury, when in December, 1931, its treasurer, Vincent Wakefield, pledged them to appellant as additional collateral to secure a personal debt then owing by Wakefield to the appellant. This debt had existed for some time, and was secured by the pledge of 200 shares of the capital stock of Middle West Utilities Company, and appellant, through its vice president, Dick A. McDonald, had on several occasions called upon Wakefield for additional collateral security. Wakefield had assured McDonald that he "would give him the additional collateral at the very earliest possible moment." In December, 1931, McDonald again called upon Wakefield for additional collateral, and they had a rather lengthy conversation in regard to it. It is plainly inferable that McDonald then knew that Wakefield did not have any securities to put up for additional collateral. Wakefield had promised, as stated, to give additional collateral at the very earliest possible moment, and in this conversation he said he had contemplated asking the assistance of Mr. Insull, but had been loath to do so (meaning that he had not done so). McDonald also knew that Wakefield was treasurer of the appellee. He suggested to Wakefield "that officials of various companies were being supplied with collateral to secure their obligations"; "that other companies were helping their officers;" "that perhaps he could make some arrangement with his people to additionally secure his obligation." In the discussion McDonald said, "Of course, you use your own judgment about it, Vincent. I do not think you need to hold back. It is being done generally through other corporations that I have knowledge of." The conversation occurred in December, 1931, but neither of the only witnesses to it (Wakefield and McDonald) specifies the day. Following the conversation and on about December 29, 1931, "or a few days prior thereto," Wakefield brought the bonds in suit to the bank and deposited them with appellant as additional security for his debt. There is no testimony as to anything being said at the time this was done and McDonald tes-

tified "that at the time the bonds were so deposited he had no knowledge of the ownership of the bonds." After so pledging the bonds, Wakefield wrote a letter to the president of appellee explaining the situation, the letter being written, as Wakefield says, "under the direst pressure I ever knew in my years of experience." Both the president and vice president of appellee assumed to authorize Wakefield to use the bonds as he did, and to ratify and confirm his acts. Wakefield delivered a receipt to his company for the bonds and later gave it a policy on his life in the sum of $10,000 to secure his obligation.

The articles of incorporation of appellee provide in part that it shall have power "to guarantee interest, dividends, or other returns to the holders of securities or other obligations of other persons or companies in cases wherein it shall be advantageous to this company so to do." The trial court concluded that the use of the bonds was not authorized by the articles of incorporation; that although the appellant had no actual knowledge that the bonds were not the property of Wakefield at the time they were pledged, appellant was not a holder in due course, but was charged with notice that Wakefield had no right to pledge the bonds to it to secure his personal debt.

Appellant contends before this court (1) that the officers of appellee were authorized by its articles of incorporation to allow Wakefield to use the bonds of the corporation as he did, and that the transaction was ratified by the corporation; (2) that the appellant was a holder in due course.

▪ 1. The theory of the appellant is that when the officers of appellee allowed Wakefield to take the bonds to pledge for his own debt, "the corporation was guaranteeing a return to the holder of an obligation of another person" within the meaning of the provision of the articles of incorporation above quoted, and it cites Finance Company of Pennsylvania v. New Jersey Short Line (D. C.) 193 F. 507. In that case a holding company loaned its moneys to operating companies whose stock was all owned by the holding company to enable the operating companies to meet interest obligations on their bonds. The loans were amply authorized by the express provisions of the articles of incorporation of the holding company, which empowered it "to aid in any manner any other corporation of which any stock or bonds, etc. are held by this corporation." But in this case the power of the corporation to guarantee the obligation of another person was expressly limited "to cases wherein it shall be deemed advantageous to this company so to do," and the advantage to the company referred to in the phrase cannot be dissociated from the furtherance of the business which the company was organized to carry on, and only an advantage in the sense of consideration moving to the company can be inferred. It would require very clear and express language to convince that there was an intent to confer power upon a corporation which holds corporate property as a trust fund for its stockholders and creditors, to guarantee vicariously the obligations of others without consideration to itself. The contention of appellant is ruled against it on the authority of Park Hotel Co. v. Fourth Nat. Bank (C. C. A. 8) 86 F. 742; Germania Safety-Vault & Trust Co. v. Boynton (C. C. A. 6) 71 F. 797, 798; Pennsylvania R. R. Co. v. St. Louis, etc., R. R., 118 U. S. 290, 6 S. Ct. 1094, 30 L. Ed. 83; Pantaze v. Murphy (C. C. A. 5) 54 F.(2d) 895; Mapes v. German Bank of Tilden (C. C. A. 8) 176 F. 89; Hamburg Bank et al. v. Ouachita Natl. Bank (C. C. A. 8) 78 F.(2d) 100.

The claim of ratification must also be denied because, as the corporation was without power to guarantee the debt of Wakefield, it was equally without power to ratify such guarantee. Park Hotel Co. v. Fourth Nat. Bank, supra; Germania Safety-Vault & Trust Co. v. Boynton, supra.

▪ 2. Is the appellant a holder in due course of the negotiable bonds?

The appellee contends that the fact that Wakefield was treasurer of the corporation whose bonds he was using to secure his own debt was sufficient to put the appellant on inquiry as to Wakefield's authority. In re German Savings & Loan Assn. (C. C. A. 7) 253 F. 722, 724; Germania Safety-Vault & Trust Co. v. Boynton, supra; Lamson v. Beard (C. C. A. 7) 94 F. 30, 45 L. R. A. 822; Wilson v. M. E. R. Co., 120 N. Y. 145, 24 N. E. 384, 385, 17 Am. St. Rep. 625; Garrard v. Pittsburgh, etc., R. R. Co., 29 Pa. 154; Board of Education v. Sinton, 41 Ohio St. 504; Farrington v. South Boston R. Co., 150 Mass. 406, 23 N. E. 109, 5 L. R. A. 849, 15 Am. St. Rep. 222; Park Hotel Co. v. Fourth Nat. Bank, supra; Thompson on Corporations (3d Ed.) § 1810.

In Re German Savings & Loan Ass'n, supra, it appears that the officer of the corporation went to the various places of business of the claimants and offered them the corporation's certificates of indebtedness, having the face characteristics of general corporation negotiable bonds payable to bearer ten years after date, as security for his personal debts. The Court of Appeals of the Seventh Circuit said: "What evidence there is tends to prove that the claimants were not good-faith purchasers. Pfau, secretary and general manager of the bankrupt, went to the various places of business of the claimants and offered them the bankrupt's certificates, payable to bearer, as security for his personal debts. True, Pfau was the bearer; but each certificate was itself also a bearer—bearer of information that Pfau was the agent to act in the bankrupt's interest. It was not to the bankrupt's interest to pay or secure Pfau's debts. This self-evident collision of Pfau's personal interest with his official duty should have put the claimants on guard."

In Wilson v. M. E. R. Co., supra, the court said: "Undoubtedly the general rule is that one who receives from an officer of a corporation the notes or securities of such corporation, in payment of, or as security for, a personal debt of such officer, does so at his peril. Prima facie the act is unlawful, and unless actually authorized the purchaser will be deemed to have taken them with notice of the rights of the corporation."

In Germania Safety-Vault & Trust Co. v. Boynton, supra, the Circuit Court of Appeals of the Sixth Circuit, speaking through Lurton, then Circuit Judge, said: "The conceded facts are that these bonds were used by Herman and Pank as collateral security for their individual debt to Boynton. Herman and Pank were both officers of the Kentucky Malting Company, and as such their possession of these corporate securities was presumably the possession of the corporation. Boynton knew that Herman was the president, and Pank the secretary and treasurer, of the corporation whose bonds they proposed to give him as security for their individual debt. Under these circumstances, it was his duty to inquire as to their title to these bonds, or their authority to use them for their private purposes. If he took them without informing himself as to their right to dispose of them, he cannot stand as a bona fide purchaser of negotiable securities for value, if it should turn out that they had no right to use them as security for their own debt. The general presumption in favor of such officers of a corporation might support a disposition of the securities for any apparent corporate purpose, but that presumption does not extend so far as to justify one who accepts such securities in payment of, or as security for, the private obligation of the officer. There is no presumption that even a general agency will support a transaction by which the agent is to profit at the expense of his principal. The dealing between Boynton, on the one side, and Herman and Pank, on the other, was concerning their individual matters, in which the corporation was not concerned. When, therefore, Herman and Pank proposed to use securities of the corporation in which they were officers for their private purposes, the knowledge of Boynton that they were officers of the corporation issuing the bonds was notice to him that they had no authority to use them for such purposes." Although it appears further along in the opinion of Judge Lurton that Boynton, who claimed to be holder, in due course of the bonds in controversy in the case, was actually aware of sufficient facts to inform him that the bonds were issued ultra vires and the quoted declaration of law may not have been absolutely necessary to a decision of the case, the declaration appears to have remained unchallenged in the Sixth Circuit. See, also, Kenyon Realty Co. v. National Deposit Bank, 140 Ky. 133, 130 S. W. 965, and extensive note thereto, 31 L. R. A. (N. S.) 169; also 3 R. C. L., § 291; and Fletcher Cyclopedia Corporations, §§ 2716, 462.

On the other hand, the appellant cites Farmers' Loan & Trust Co. v. Madison Mfg. Co. (C. C.) 153 F. 310, decided by Circuit Judge Shelby sitting in the District of Alabama. The decree in that case was appealed to the Circuit Court of Appeals of the Fifth Circuit. That court adopted the opinion of the court below and affirmed. Alabama Nat. Bank of Birmingham v. Massassoit-Pocasset Nat. Bank, 158 F. 1019. The Supreme Court denied certiorari, 212 U. S. 572, 29 S. Ct. 682, 53 L. Ed. 656. The doctrine of the case is that where the treasurer of a corporation has possession of its bonds and pledges them to secure the debt of a firm in which he is personally interested, the pledgee "was not charged with notice of any infirmity there-

in because it had knowledge of the treasurer's official connection with the corporation." The court quoted the following from Rockville Natl. Bank v. Citizens' Gas Light Co., 72 Conn. 576, 45 A. 361, with approval: "It is idle to claim that such facts, as a matter of law, charge the plaintiff with knowledge that [the treasurer] in truth holds the bonds in a fiduciary capacity, or has obtained possession of them through a secret fraud." It also quoted from Kaiser v. First National Bank of Brandon, 78 F. 281, where the Circuit Court of Appeals of the Fifth Circuit held that the pledge, as security for his own debt by the president of a corporation, of notes bearing the corporation's endorsement, "does not show a case where [the pledgee] was charged with any such notice of outstanding rights and equities as put it upon further inquiry."

We are not cited to any conclusive decision in the Supreme Court or in the Eighth Circuit, and we are satisfied that the decision of this appeal need not be rested solely upon the question of law debated.

The particular circumstances disclosed by the evidence compel denial of the status of holder in due course to the appellant. Here is not a case where the officer of the corporation went on his own initiative to his creditor offering the bonds of his corporation as security for his personal debt accompanied by either actual or implied representation that he had a right to do so. On the contrary, it appears that McDonald was not only pressing Wakefield for additional collateral when it was apparent to him that Wakefield did not own any such collateral, but the relation of Wakefield as treasurer of appellee was clearly in McDonald's mind when his various suggestions about ways for Wakefield to get the collateral were thrown out. We need not impute any actual dishonesty. But there was direct reference to gratuitous assistance from corporations to officers. It may well be, as found by the trial court on the positive oath of McDonald, that appellant did not have actual knowledge that the bonds which Wakefield brought into the bank were not his own. But the fiduciary relation of Wakefield as treasurer of the corporation and McDonald's knowledge thereof cannot be disregarded in weighing the evidence concerning the transaction, and McDonald's suggestions to Wakefield, followed so closely by Wakefield's appearance with the eighteen $1,000 bonds, presented a situation which fully sustains the trial court's refusal to find the appellant a holder in due course of the bonds. "No rule of law protects a purchaser who willfully closes his ears to information, or refuses to make inquiry when circumstances of grave suspicion imperatively demand it." Lytle v. Town of Lansing, 147 U. S. 59, 71, 13 S. Ct. 254, 259, 37 L. Ed. 78. It is nowhere doubted that where "circumstances are such as to justify the conclusion that the failure to make inquiry arose from a suspicion that inquiry would disclose a vice or defect in the" title, the pledgee is charged. Nickey Bros. v. Lonsdale Mfg. Co., 149 Tenn. 1, 257 S. W. 403, 406, 31 A. L. R. 1383.

■ It. is argued that the trial court did not in express terms find as a matter of fact that appellant was guilty of bad faith. Its finding was that appellant had made no inquiry, and it concluded appellant was bound to make inquiry, and, having failed to make inquiry, it "cannot now claim that the bonds were acquired in good faith." No specific findings having been requested and the case having been tried in equity, we cannot say that the trial court failed to consider the question of appellant's good faith. He had the witnesses before him, particularly McDonald and Wakefield. It is manifest from the record that everything that had been said in the lengthy conversation between them was not brought out in their testimony, and they make no disclosure of anything being said when the bonds were produced, and there is no statement by McDonald that he believed Wakefield to be the owner of the bonds. Such omissions were of significance as well as the statements to which they did testify.

■ The testimony before the court compels the conclusion that the appellant's failure to make inquiry arose from justified fear that inquiry would disclose defect in Wakefield's title to the bonds. Meyer v. Guardian Trust Co. (C. C. A. 8) 296 F. 789. Having been put upon inquiry, the appellant became chargeable with knowledge of the appellee's lack of power to guarantee or secure Wakefield's personal debt. Cordova v. Hood, 17 Wall. 1, 21 L. Ed. 587; In re Hackett, Hoff & Thiermann (C. C. A. 7) 70 F.(2d) 815.

The decree of the trial court was right. Affirmed.